# NEW YORK SUPERIOR COURT.

GEORGE W. PLATT and NATHAN C. PLATT agt. HENRY WELLS, President of the American Express Company.

*Where an express company show by prima facie evidence that they either delivered a box of goods to the authorized agent of the person to whom it was addressed, or that the seller of the goods from whom the company received the box had sanctioned the delivery to such alleged agent; in either case the company are discharged from liability to the seller for the non-delivery of the goods to the person to whom the box was addressed.*

*General Term, February,* 1864.

*Before* ROBERTSON, *C. J.,* GARVIN *and* McCUNN, *JJ.*

IN June, 1855, the plaintiffs, merchants in the city of New York, made a *conditional sale* of jewelry of the value of $8,500 to Larue P. Anderson. The conditions were that it was to be paid for in a note, to be signed by Anderson and one Daniel C. Munro, and guarantied by one John Munro, payable in one year from date, and that the jewelry should be sent by plaintiffs to Daniel C. Munro, to be by him delivered to Anderson, upon the making and delivery to plaintiffs of the promissory note above described.

The goods were delivered by the plaintiffs to the American Express Company, for carriage, on the 9th day of June, 1855, directed to "Daniel C. Munro, Elbridge." Elbridge was the residence of Daniel C. Munro. Defendants agreed to forward the box to "Junction," a place near the residence of Munro. On the 11th day of June the box arrived safely at "Junction;" on the same day Anderson went to the house of Daniel C. Munro and told him that he was expecting a box of goods from New York, which was directed to him (Munro) and asked Munro to go with him to get it. Munro replied that "he could not go at that time, that he (Anderson) could get the box just as well without him as if he was there."

Anderson said "he did not know as they would let him have the box." Munro told him "he thought they would; that he (Anderson) could get the box as well without him as with him; that he could get the box." Munro had not received any notice from the plaintiffs that the box had been sent to him. The plaintiffs had mailed a letter to Munro on the 9th of June, informing him that the box had been forwarded, marked to him; they also enclosed to him in the letter a note to be signed by him for the goods in pursuance of the understanding between plaintiffs and Anderson.

This letter was never received by Munro, and he was entirely ignorant of the arrangement and understanding between plaintiffs and Anderson in regard to the terms and conditions of the purchase of the goods, or that the goods were to be forwarded to him, or that he was to have anything to do with them.

After the interview between Anderson and Munro on the 11th of June, Anderson went directly to the railroad depot, and got the box; he placed it in his wagon and returned with it to Munro's house. He told Munro he had the box; he was asked to bring it in; he expressed an unwillingness to do that, but requested Munro to come to Auburn the next day. Munro went next day to Auburn, saw the jewelry and got from Anderson about $300 in value of it in payment of a debt Anderson owed him.

On the 14th of June plaintiffs received a letter which purported to be written by Anderson and Munro, enclosing a note for $8,500 for the goods in question, signed with their names, and purporting to be guarantied by John Munro. The letter and note as to Munro were forgeries. The note was drawn payable in one year. The forgery was not ascertained by plaintiffs until the maturity of the note.

On the same day that the plaintiffs received the note they also received a letter from Anderson stating that he

had received the goods and he pointed out to plaintiffs an error in the invoice.

In June, 1856, after the forgery was discovered plaintiffs sued Anderson on the note in the district court in the state of Wisconsin, alleging, among other things, that the note was given for " goods sold and delivered."

The express company was ignorant of the agreement or understanding between Anderson and the plaintiffs in regard to the sale of the goods, and the reasons of their being forwarded to Munro.

This action was commenced in May, 1861.    The issues were referred for trial to the Hon. B. W. Bonney as sole referee, who reported in favor of the defendants.

The referee deciding that the delivery by the American Express Company of the box, under the circumstances, was a sufficient performance by the company of their contract or obligation to deliver the same, and exonerated the company from any liability to the plaintiffs therefor.

From the judgment rendered in favor of the defendants upon the report of the referee the plaintiffs appealed to the general term of this court.

WILLIAM R. MARTIN, *for appellants.*
HOOPER C. VAN VORST, *for respondents.*

By the court, ROBERTSON, Chief Justice.    Mr. Munro, to whom the box of jewelry in question was directed, had neither made, or offered to make, any contract with the plaintiffs.    That fact was not communicated to the defendants.    They were equally ignorant of whatever fraud, if any, had been perpetrated by Anderson in inducing the plaintiffs to send it so directed.    Their duty ended with delivering the goods either to Munro or some one authorized by him to receive them.    Whether Munro was a party to the fraud, in taking possession of them, or was deceived by Anderson, in procuring authority from him to receive

them, was immaterial to the defendants. Munro was the trusted agent of the plaintiffs, if not the presumptive owner of the goods, so far as they were concerned. (*Sweet* agt. *Barney*, 23 *N. Y. R.* 335, 6 ; *Everett* agt. *Saltus*, 15 *Wend. R.* 475 ; *Fitzhugh* agt. *Wiman*, 5 *Seld. R.* 562.)

Munro knew that Anderson meant to buy jewelry in New York, for he had refused to endorse his note for the purpose, but was destitute of any information from the plaintiffs, as to the sending of the box, or the object of its direction. Under these circumstances, Anderson, on calling on him, informed him he (Anderson) had a box containing jewelry directed to him (Munro) which had been so directed, at the request of one of the plaintiffs, and asked him to get it because it was so directed. Munro first said he (Anderson) could get it just as well without him as if he were there. To which Anderson replied, he did not know as they would let him have the box. Munro said he thought they would ; that he (Anderson) could get the box as well without him as with him. When Anderson repeated they would not let him have it, Munro again said he thought they would, but finally told him " to get the box." Upon this Anderson immediately left to get the box, brought it to Munro's house, told him he had it, declined to bring it in, and carried it away. Munro not only made no objection to all this, but subsequently received from Anderson part of the contents in payment of an old debt. He was so strongly impressed with the belief that he did authorize Anderson in some way to get the box that he testified that he did not know but that Anderson asked him if he (Anderson) should tell them that he (Munro) told him he might get it, and if he did he (Munro) told him to say so. This, it is true, is merely hypothetical, when standing alone, but when taken in connection with the rest of Munro's testimony, is strong evidence of the impression on his mind that he had been ap-

plied to by Anderson for authority to get the box, and that he used some language warranting Anderson in getting the box as his agent. Without such authority the latter, in order to get it, must have been guilty of the crime of obtaining it by false pretences, or a constructive larceny. Munro then knew that Anderson applied to him for authority, and immediately went to get the box on the strength of what he said, obtained it, and brought it to his (Munro's) door, and carried it away, he subsequently receiving part of the contents. After what passed he must have supposed that Anderson used his name to get the box, or in some way induced the defendants to believe he had his authority for getting it; yet he seems to have made no inquiry on the subject, nor does he appear to have warned the defendants that they had delivered the box without authority. Probably he thought he never could be made liable, provided he did not receive the box personally. He had made no personal contract with the plaintiffs. Anderson procured the box to be sent on, and was the party to be benefited; it was sent to a station near his house, and might have been a matter of mere accommodation.

There was, therefore, at least some evidence that the defendants delivered the property in question to Anderson as Munro's authorized agent. Besides this, the plaintiffs, a few days afterwards, received a letter from Anderson stating that he had examined the goods sent with the bills and found all correct, with certain specified exceptions; to which the plaintiffs replied, explaining the objections. A note signed by Anderson for the price of such goods, with forged signatures, was received by the plaintiffs, not to become due until a year afterwards. The latter, on discovering the forgery, which was after such note became due, commenced a suit on it in Wisconsin against Anderson, in which an attachment was issued.

One of the plaintiffs, in an affidavit made to obtain such

attachment, stated that such note was given for a valuable consideration, to wit: *for goods sold and delivered.* The plaintiffs, after the notice to them by the correspondence with Anderson, that the goods had been delivered to him, thereby ratified such delivery. (2 *Kent's Com. 7th ed.* 480; *note cases cited; Green* agt. *Clark,* 5 *Denio R.* 503.)

It is true they were probably induced not to make any objections or inquiry for a year by the forged note; but, after the discovery of such forgery, they still assumed the ownership of the note by suing upon it, and swearing that it was received for goods sold and delivered, and thereby were enabled to seize certain goods. The defendants never heard an objection to the delivery until a short time before they were sued, and after the suit against Anderson; although as between the plaintiffs and Anderson the delivery or rather retention of the goods by the latter, by the agency of a forged note, would not have prevented the former from reclaiming them. Yet if the plaintiffs had even by such means been induced to sanction their delivery by the defendants, they would thereby have discharged the latter from liability as carriers. They not being parties thereto, were not responsible for impositions practiced on the plaintiffs by Anderson to induce them to sanction the delivery after knowledge of it.

The referee has not found expressly the agency of Anderson in receiving the goods for Munro, or the sanction by the plaintiffs of their delivery. One or the other was necessary to sustain his report and judgment; but there is sufficient *prima facie* evidence of both. They are certainly at least not so clearly disproved as to warrant an interference with such judgment.

The judgment must be affirmed with costs.